**TRANSWESTERN PIPELINE COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

Nos. 85–4597, 86–4550.

United States Court of Appeals, Fifth Circuit.

July 7, 1987.

James E. McCartney, Judy M. Johnson, David T. Andril, Vinson & Elkins, Cheryl M. Foley, Transwestern Pipeline Co., Houston, Tex., for petitioner.

Dwight Cooper Alpern, Jerome M. Feit, Sol., F.E.R.C., A. Karen Hill, Washington, D.C., for respondent.

John T. Stough, Jr., Kevin J. Lipson, Washington, D.C., for Gas Co. of New Mexico, a Div. of Public Service Co. of New Mexico.

J.D. Stillman, Tulsa, Okl., Joseph S. Koury, Washington, D.C., John B. Rudolph, for Northwest Cent. Pipeline Corp.

Michael D. Gayda, Los Angeles, Cal., for Southern California Gas Co.

Arnold D. Berkeley, Richard E. Chaifetz, Washington, D.C., for Arizona Elec. Power Co-op., Inc. and The City of Willcox, Ariz.

David L. Huard, Los Angeles, Cal., for Pacific Interstate Transmission Co., Pacific Offshore Pipeline Co., and Pacific Interstate Offshore Co.

Robert J. Haggerty, Washington, D.C., for Southern Union Gas Co., a Div. of Southern Union Co.

Scott D. Fobes, Richard Owen Baish, Donald J. MacIver, Jr., El Paso, Tex., Richard C. Green, Hogan & Hartson, Washington, D.C., for El Paso Natural Gas Co.

Janice E. Kerr, J. Calvin Simpson, Michael B. Day, Legal Div., San Francisco, Cal., for the Public Utilities Com'n of State of Cal.

E.R. Island, Michael D. Gayda, Terminal Annex, Los Angeles, Cal., for Pacific Lighting Gas Supply Co. and Southern California Gas Co.

Herbert I. Zinn, Phoenix, Ariz., for Arizona Public Service Co.

John R. Staffier, John H. Burnes, Jr., Washington, D.C., for Pan-Alberta Gas Ltd.

George W. McHenry, Jr., John H. Burnes, Jr., Washington, D.C., for Foothills Pipe Lines (Yukon) Ltd.

J. Michael Reidenbach, San Francisco, Cal., for Pacific Gas and Elec. Co. and Pacific Gas Transmission Co.

Before CLARK, Chief Judge, THORNBERRY, and HIGGINBOTHAM, Circuit Judges.

CLARK, Chief Judge:

Petitioner Transwestern Pipeline Company (Transwestern) seeks review of Opinion Nos. 238 and 238–A and other related orders of the Federal Energy Regulatory Commission (the Commission). *See Transwestern Pipeline Company*, Opinion No. 238, 32 FERC ¶ 61,009 (1985), *reh. denied*, Opinion 238–A, 36 FERC ¶ 61,175 (1986); *see also Pacific Gas Transmission Company*, 28 FERC ¶ 61,217 (1984), *reh. denied*, 32 FERC ¶ 61,001 (1985), *reh. denied*, 36 FERC ¶ 61,176 (1986).

In generic Order No. 380,[1] the Commission eliminated interstate natural gas pipelines' minimum commodity bills to the extent these provisions permitted the recovery of variable costs. The Commission reasoned that such variable-cost minimum bills inhibited competition without justification by forcing a pipeline's customers to buy its gas rather than less costly gas from other sources. This order and its rationale were approved by the District of Columbia Circuit in *Wisconsin Gas Co. v. Federal Energy Regulatory Commission (FERC)*, 770 F.2d 1144 (D.C.Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 1968, 90 L.Ed.2d 653 (1986).

Questions of the lawfulness of the fixed-cost portion of minimum bills were left to be resolved in individual pipeline proceedings. This is such a proceeding. Transwestern petitions this court to review orders of the Commission which eliminated its fixed-cost minimum bills as applied to its two principal customers and terminated the Commission's investigation into the minimum bill practices of other interstate pipelines supplying California. The Commission's conclusion that Transwestern's fixed-cost minimum bills were unjust and unreasonable because the practice constituted an unreasonable restraint of trade was based on substantial evidence. The remedy imposed was a proper exercise of the Commission's authority under the Natural Gas Act (NGA) and was neither arbitrary nor capricious. It was within the Commission's discretion to terminate its investigation of the other pipelines and determine the lawfulness of Transwestern's fixed-cost minimum bills on the record before it. We affirm.

I. Background

A. *Facts*

Transwestern owns and operates an interstate natural gas pipeline subject to the jurisdiction of the Commission. It provides firm service to two partial requirements

[1]. *Elimination of Variable Costs from Certain Natural Gas Pipeline Minimum Commodity Bill Provisions*, Order No. 380, 27 FERC ¶ 61,318; Order No. 380–A, 28 FERC ¶ 61,175; Order No. 380–B, 29 FERC ¶ 61,076; Order No. 380–C, 29 FERC ¶ 61,077; Order No. 380–D, 29 FERC ¶ 61,332 (1984).

customers, Southern California Gas Company (SoCal) and Northwest Central Pipeline Company (Northwest), which account for more than 99.5 percent of Transwestern's gas sales. SoCal is a local distribution company which sells gas both for resale and for ultimate consumption within the State of California. Transwestern competes for natural gas sales to SoCal with other interstate pipelines and various other sources, including gas sold on the spot market. The largest interstate pipeline serving California and Transwestern's primary competitor there is El Paso Natural Gas Company (El Paso). Northwest is an interstate pipeline which sells primarily to local distribution companies in the Midwest. The majority of its sales are to Kansas Power and Light Company serving the Kansas City, Missouri area.

The Commission first authorized Transwestern to provide service to SoCal's affiliate, Pacific Lighting Gas Supply Company (Pacific),[2] in 1959, when it issued Transwestern a certificate of public convenience and necessity pursuant to § 7 of the NGA, 15 U.S.C. § 717f, to construct an interstate pipeline and sell up to 350 million cubic feet (MMcf) of gas per day. Additional certificates have been issued over the years to Transwestern to expand facilities and sell 750 MMcf per day to SoCal.

The 1959 certificate was conditioned upon Transwestern's filing an initial rate schedule based on the *Seaboard* method[3] of cost classification, cost allocation, and rate design. Under this method, 50 percent of Transwestern's fixed transmission costs and all its "as billed" fixed costs are treated as parts of the demand charge component of the rate and the remaining fixed transmission costs plus all fixed production costs and all its variable costs are classified as parts of the commodity charge. The demand charge is calculated based on the contract demand quantity, which in SoCal's case is 750 MMcf of gas per day. This

charge is paid by the customer regardless of how much gas is taken. The commodity charge calculation is based on the number of units of gas sold.

The schedule also included a 91 percent minimum annual commodity bill provision based on the annual contract quantity, which is calculated by multiplying SoCal's contract demand quantity of 750 MMcf per day times 365 days a year. In effect, the minimum bills obligated SoCal to take gas pursuant to the rate schedule or pay Transwestern as if it had taken an average of 682.5 MMcf per day (91 percent of the contract demand quantity) or such lesser amount as Transwestern tendered.[4]

In 1965, the Commission authorized Transwestern to sell 100 MMcf per day to Northwest's predecessor, Cities Services Gas Company. This amount has since been increased to 250 MMcf per day. While the rates in the initial schedules for Northwest were developed using a method different from that used for SoCal, Transwestern's rate design for both principal customers now uses the same method. At the time of Transwestern's rate filing this was the *Seaboard* method. The rates applicable to Northwest also included a 90 percent minimum annual commodity bill.

There is a significant difference, however, between the minimum bills applicable to SoCal and those applicable to Northwest due to a "ratchet" provision in the Northwest agreements. The contract demand quantity which the Northwest contracts specified was to be used in calculating the annual contract quantity did not equal the 250 MMcf per day that Transwestern is authorized to deliver. Transwestern's agreements with Northwest provided that if Transwestern was unable to deliver the daily contract demand quantity, the average daily quantity actually delivered would become the new contract demand quantity

---

**2.** SoCal and Pacific were both parties in the proceedings before the Commission. Pacific was recently merged into SoCal. We will often refer to them jointly as "SoCal."

**3.** *See Atlantic Seaboard Corp.,* Opinion No. 225, 11 FPC 43 (1952).

**4.** After Order No. 380 eliminated variable-cost recovery from all interstate pipelines' minimum bills, SoCal was not required to pay the full commodity rate for gas not taken, but only the fixed-cost portion. We explain in more detail below.

in calculating the minimum bill for that year and for every year thereafter. During the 1970's, Transwestern was in severe curtailment and could not deliver 250 MMcf per day to Northwest. Thus, the contract demand quantity used in calculating Northwest's minimum bills was permanently reduced. The ratchet provision in Northwest's minimum bill obligation eventually reduced its take-or-pay requirement to only 59 percent of the 250 MMcf Transwestern is authorized to deliver.

For years neither SoCal nor Northwest had any complaints about the effect of Transwestern's minimum bills. In fact, if the two customers had any complaints it was due to curtailment of natural gas supply rather than any surplus which may have been forced upon them. Then in 1982, both customers had more gas available from Transwestern and other suppliers than they needed to meet demand. This oversupply was in part due to the customers' efforts during the 1970's to develop alternative sources of supply in response to curtailment. Those projects began to produce in the early 1980's. The oversupply was also a consequence of the recession and an increase in gas prices since 1978. In addition, residential consumers conserved gas and switched to electricity, and industrial customers switched to fuel oil, which had become competitive. In short, the natural gas supply was suddenly much greater than the demand; the natural gas surplus, however, was not immediately accompanied by a decrease in gas prices.

### B. *Course of Proceedings*

In August 1981 Transwestern filed increased natural gas rates for its customers pursuant to § 4 of the NGA, 15 U.S.C. § 717c. The Commission set the increased rates for hearing, and the parties soon settled most of the disputes concerning the reasonableness of the increased rates. However, they were unable to settle disputes concerning the reasonableness of Transwestern's full-cost minimum bills and its method for cost allocation and rate design. Hearings on these issues were held in June and July of 1983.

Recognizing that the Commission's investigation under § 5 of the NGA, 15 U.S.C. § 717d, of other interstate pipelines supplying California raised similar full-cost minimum bill questions, the Chief Administrative Law Judge (the Chief ALJ) consolidated the Transwestern proceeding with these other cases in December 1983. The Commission affirmed the Chief ALJ's decision.

On May 25, 1984, the Commission issued Order No. 380 eliminating variable costs from the minimum bills of interstate pipelines, including Transwestern. In August 1984, the Commission suspended the consolidated proceeding which included Transwestern's case, in part because Order No. 380 and related rehearings could dispose of many of the issues, and in part because El Paso, Transwestern's major competitor in the southern California market, and its customers reached a settlement setting the fixed-cost minimum bill provision at 60 percent.[5] Transwestern's docket, however, was severed for expedited decision since the case had been ready for decision for over a year.

The presiding Administrative Law Judge (the presiding ALJ) issued a decision in the severed Transwestern case in December 1984, reducing Transwestern's fixed-cost minimum bills to 60 percent and rejecting any change in the rate design. On review, the Commission totally eliminated the fixed-cost minimum bills in Opinion No. 238 and denied rehearing in Opinion No. 238–A.[6]

The Commission affirmed the presiding ALJ's finding that the differences between SoCal's and Northwest's minimum bills

---

**5.** *See Pacific Gas Transmission Co.,* 28 FERC ¶ 61,217 (1984) (approving most of El Paso settlement). The Commission eventually terminated the consolidated proceeding because most of the issues had been resolved, including the lawfulness of Transwestern's fixed-cost minimum bills. *See Pacific Gas Transmission Co.,* 32 FERC ¶ 61,001 (1985), and 36 FERC ¶ 61,176 (1986).

**6.** *Transwestern Pipeline Co.,* Opinion No. 238, 32 FERC ¶ 61,009 (1985), *reh. denied,* Opinion 238–A, 36 FERC ¶ 61,175 (1986).

constituted undue discrimination. This finding was based on the fact that Northwest's minimum bill obligation had ratcheted downward to approximately 59 percent of its actual contract demand quantity while SoCal's remained at the 91 percent level. The ALJ's conclusion that Transwestern's minimum bills should not be eliminated, but rather decreased to 60 percent to remedy the discrimination and place Transwestern's minimum bills at the same level as those of its major California competitor, El Paso, was rejected by the Commission. It found that Transwestern's minimum bills unreasonably restrained trade and thus were unjust and unreasonable. The Commission observed that Transwestern's minimum bills forced Northwest and SoCal to purchase gas from Transwestern even though alternative lower-cost supplies were available, and it found that the minimum bills were not justified. In particular, the Commission concluded that Transwestern's fixed-cost minimum bills allowed it to recover certain fixed costs which should not be guaranteed free from risk—equity return, related taxes, and fixed production costs. The Commission adopted a new modified fixed variable rate design method which would assure that Transwestern recovered those fixed costs which it was entitled to recover on a risk-free basis. These fixed costs—debt costs and depreciation—would be recovered through the demand charge, which the customer pays based on its contract demand quantity regardless of gas taken.

## II. Review of the Commission's Orders

Transwestern petitions this court to review the Commission's orders in Opinion Nos. 238 and 238-A which eliminate Transwestern's minimum bills and the related orders of the Commission which terminate the investigation of other interstate pipelines. The Commission declared Transwestern's fixed-cost minimum bills unlawful and entirely eliminated such bills pursuant to its authority under §§ 4 and 5 of the NGA to regulate rates, charges, and practices of natural gas companies under its jurisdiction.

Section 4(a) provides that rates charged by natural gas companies "shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful." 15 U.S.C. § 717c(a). Section 5(a) provides the basis for the Commission's authority to examine rates to determine whether they comply with the § 4 standard:

(a) Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order....

In reviewing the substance of the Commission's orders, we are initially guided by § 19(b) of the NGA, which provides that the Commission's factual findings, "if supported by substantial evidence, shall be conclusive." 15 U.S.C. § 717r(b). The Supreme Court has emphasized that "Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise...." *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968). In adherence to the principles articulated in *Permian Basin Area Rate Cases*, this court reviews the Commission's actions on the basis of "(1) whether the Commission abused or exceeded its authority, (2) whether the essential elements chosen by the Commission for its order are supported by substantial evidence, and (3) whether the

'end result' is unjust and unreasonable." *Tenneco Oil Co. v. FERC,* 571 F.2d 834, 838 (5th Cir.), *petition for cert. dismissed,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978) (citing *Permian Basin Area Rate Cases,* 390 U.S. at 791–92, 88 S.Ct. at 1373); *Cities Service Gas Co. v. FERC,* 623 F.2d 1002, 1004–05 (5th Cir.1980).

### A. *Undue Discrimination*

██ Transwestern's first challenge to the substance of Opinions No. 238 and No. 238–A focuses on the Commission's discussion of "undue discrimination." Transwestern argues that the Commission's determination that SoCal and Northwest were "similarly situated" customers is not supported by substantial evidence. Transwestern contends that the Commission has misconstrued the relationship between private contracts and regulation under the NGA. Transwestern further asserts that the remedy imposed by the Commission— the total elimination of Transwestern's minimum bills—was arbitrary and capricious since a finding of unlawful discrimination at most warrants the equalization of the minimum bill levels between customers, not abrogation. Because Transwestern identifies this issue as the Commission's "key finding," we address it preliminary.

At the outset, we would note that the challenged "undue discrimination" finding is not an essential element of the Commission's ultimate determination. The presiding ALJ did not declare Transwestern's minimum bills anti-competitive. Instead, he based his decision on a finding that similarly situated customers were treated differently without justification. The ALJ eliminated that discrimination by reducing Transwestern's minimum bills to a 60 percent level which would equal El Paso's minimum bill level to SoCal. Although the Commission discussed the discrimination issue and generally affirmed the ALJ's finding, it did not rest its decision to eliminate Transwestern's minimum bills on the ALJ's determination. The Commission's central finding is that Transwestern's fixed-cost minimum bills unreasonably restrained trade. This finding makes the ALJ's determination related to discrimination immaterial. The remedy imposed by the Commission does not stem from any difference between Transwestern's minimal bills to Northwest and its minimum bills to SoCal.

Under § 5 of the NGA, once the Commission found Transwestern's minimum bill practice unlawful, it had the authority to "determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force...." Transwestern's contention that the elimination of its minimum bills was an arbitrary and capricious remedy is thus without merit.

### B. *Substantial Evidence*

The Commission's determinations that Transwestern's fixed-cost minimum bills were anti-competitive and should be entirely eliminated were based on evidence in the record of the past operation of the minimum bills and their effect on competition as well as the probable consequence such provisions would have in the future. The record in this case was closed before Order No. 380 eliminated variable-cost recovery from interstate pipelines' minimum bills. Prior to that elimination, Transwestern's minimum bills forced the customer to take or pay the full commodity rate for any minimum bill volume not taken.

The past operation of these full-cost minimum bills is generally not disputed. It is clear, for example, that the purpose of a full-cost minimum bill is to prevent customers from purchasing less expensive alternative supplies. Transwestern's Senior Vice President testified that the minimum bill was intended to assure that sales will continue to be made when the purchaser has available to it alternative supplies at lower costs. Furthermore, evidence in the record established that Transwestern's full-cost minimum bills prevented SoCal's affilliate Pacific from purchasing lower-cost gas from El Paso in 1982 because of Pacific's commitment to Transwestern to pay the full commodity rate for its minimum bill volume.

Referring to the general situation, the Commission found in Opinion No. 238 that

both Pacific and Northwest Central had to reduce their purchases from their suppliers. And they had to reduce the price at which they sold their gas. Since Transwestern was a high cost supplier for both, they should have reduced their purchases from Transwestern and increased their purchases from their lower cost suppliers. But they did not because of the necessity of meeting Transwestern's minimum bill obligations. The net effect of Pacific's and Northwest Central's doing so was that consumers paid more for gas than they might otherwise have and competitors were excluded from the markets. (footnotes omitted)

Transwestern does not take issue with this finding of competitive harm. The anti-competitive effect of full-cost minimum bills was decided in Order No. 380 and upheld by the D.C. Circuit in *Wisconsin Gas Co.*, a proceeding in which Transwestern participated.

However, variable costs constituted about 90 percent of the commodity charge in Transwestern's rates. After Order No. 380, Transwestern's minimum bills only required customers to pay about ten percent of the full commodity charge for minimum bill volume not taken. Recognizing that the record was closed before Order No. 380 eliminated variable costs from minimum bill recovery, the Commission based its finding on the anti-competitive impact of Transwestern's fixed-cost minimum bills on a prediction of how those minimum bills would operate in the future in markets served by Transwestern.

The Commission based this prediction on evidence in the record, its knowledge of the industry, and common sense. Specifically, the Commission identified three factors. First, gas supplies available in the southern California and Kansas City markets had exceeded demand for the past few years, and the oversupply was likely to continue. Second, the Commission analogized this situation to the treatment of requirements contracts under antitrust law. Where supply exceeds demand, a requirements contract by its very nature forecloses competition. As an example, the Commission referred to the situation in 1982 when lower-

cost supplies were available from El Paso, yet Pacific was forced to purchase its minimum bill volume from Transwestern. Third, the Commission observed that a fixed-cost minimum bill would continue to compel a customer to buy gas from Transwestern rather than from a lower-cost competitor. If the customer bought gas from another supplier, it would still have to pay the supplier for that gas and, in addition, pay Transwestern for the fixed-cost portion of the minimum bill volume not taken. The customer who purchased alternative supplies would suffer an economic loss unless the cost of such supplies were lower by more than the amount of the fixed-cost minimum bill—in other words, by more than ten percent of Transwestern's commodity charge.

### C. The Commission's Balance

In its initial response to the Commission's central conclusion that Transwestern's minimum bills unreasonably restrained trade, Transwestern charges that the Commission misunderstands the relationship between contracts and competition. Transwestern claims that the Commission has misapplied antitrust concepts in its effort to demonstrate the unlawfulness of Transwestern's minimum bills. Transwestern refers us to Justice Brandeis' words of caution in *Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918), that "[e]very agreement concerning trade, every regulation of trade, restrains." Transwestern apparently feels that the Commission applied a *per se* rule to strike down any contract which affected competition in natural gas sales.

Had the Commission simply determined that Transwestern's contracts with SoCal and Northwest restrained its customers' options to purchase gas from other suppliers, without more, we would be unable to approve the Commission's reasoning. The Commission did not, however, apply such a *per se* rule to eliminate Transwestern's minimum bill restraints. Instead, it used the very same "rule of reason" analysis articulated by Justice Brandeis in *Board of*

*Trade.* The Commission explained its analysis in Opinion No. 238–A:

> [B]efore we may find a contract term to be an unreasonable restraint of trade we must carefully balance the competitive harm the term causes against the term's objectives in light of the alternatives available for achieving those objectives. Only if on balance the term causes more harm than is warranted in light of the term's objectives and the available alternatives, can we find the term to be an unreasonable restraint of trade. It was only after finding that on balance Transwestern's minimum bills caused more harm than was warranted that we concluded that the minimum bills unreasonably restrained trade and hence were unjust and unreasonable. (footnotes omitted)

Transwestern urges that its contracts with its customers constitute a "reasonable" restraint of trade. Transwestern argues that its minimum bills are "considerably less restraining" than exclusive dealing contracts or full-requirements contracts which courts have upheld under the antitrust laws. This invocation of court-made antitrust standards is unpersuasive. The Commission does not enforce or apply the antitrust laws. *Cf. California v. Federal Power Commission (FPC)*, 369 U.S. 482, 484–90, 82 S.Ct. 901, 903–06, 8 L.Ed.2d 54 (1962).

■ The Commission's authority to declare a practice unlawful and to prescribe an appropriate remedy stems from §§ 4 and 5 of the NGA. The fact that the Commission may employ a "rule of reason" analysis similar to that developed by courts in antitrust cases does not subject its determination to a court rebalancing of the factors it deemed relevant. When we review the Commission's actions we are not free to apply antitrust standards. Rather, our review examines the Commission's order to assure that it has given reasoned consideration to the relevant evidence and factors before it, not "to supplant the Com-

mission's balance of these interests with one more nearly to [our] liking." *Permian Basin Area Rate Cases*, 390 U.S. at 792, 88 S.Ct. at 1373 (1968).

## D. *Possible Justifications*

The Commission found that the probable consequence of Transwestern's imposition of a minimum bill on its two partial-requirements customers would be to foreclose competition and restrain trade. The Commission then considered whether Transwestern's minimum bills were justified. In *Atlantic Seaboard Corp.*,[7] the Commission identified three "economic factors which usually justify a minimum commodity rate in a pipeline tariff." First, a minimum bill may be justified as a means of protecting the pipeline against the risk of not recovering fixed costs in the commodity component. Second, a minimum bill may be justified as a means of protecting full-requirements customers from bearing a disproportionate share of fixed costs resulting from swings off the system by partial-requirements customers. And third, a minimum bill may be justified as a means of ensuring equitable recovery from customers of a pipeline's take-or-pay costs.

### 1. *Fixed-cost Recovery*

■ Under the *Seaboard* method of rate design, the commodity charge includes fixed production costs and 50 percent of fixed transmission costs, which include equity return, related taxes, depreciation, and debt cost. The remaining fixed costs are recovered through the demand charge. The Commission found that Transwestern's fixed-cost minimum bills could not be justified on the basis that they recovered fixed costs because the minimum bills recovered costs which did not warrant risk-free recovery. Specifically, the Commission determined that the costs of depreciation and servicing the debt should be guaranteed, but that equity return, related taxes, and fixed production costs should be subject to

---

7. *Atlantic Seaboard Corp.*, Opinion No. 553, 38 FPC 91, 95 (1967), *aff'd*, 404 F.2d 1268 (D.C.Cir.

1968) (an opinion separate from the *Seaboard* rate design opinion, *supra* note 3).

risk.[8] Since Transwestern's minimum bills guaranteed recovery of all fixed costs, they could not be justified on this basis.

To permit fixed-cost recovery which is warranted, the Commission adopted the modified fixed variable rate design. Under this method, all fixed costs are assessed as parts of the demand charge, except equity return, related taxes, and fixed production costs. Thus, all fixed costs which Transwestern should recover will be recovered through the demand charge without the imposition of a minimum bill.

Transwestern responds that the Commission cannot prescribe a new mechanism for the recovery of fixed costs merely because it prefers it. Transwestern asserts that the Commission must first find the existing provision unlawful under § 5 of the NGA. The Commission, however, did not eliminate Transwestern's minimum bills because it preferred the modified fixed variable rate design to the *Seaboard* method. It first found the minimum bills unlawful because they unreasonably restrained trade. It further found that Transwestern's minimum bills were not justified on the ground that they permitted recovery of fixed costs that should not be guaranteed, not because a new method of rate design would better accomplish the purpose.

Transwestern next contends that there was no record evidence that the modified fixed variable rate design would assure the recovery of fixed costs assigned to the commodity component. Transwestern claims there was no evidence that its sales levels without minimum bills would remain

sufficient to recover those fixed costs the Commission left at risk. This begs the issue. The point of the Commission's determination was to subject certain fixed costs to market risks. The Commission placed equity return at risk, because it did not think Transwestern should be guaranteed any profit. Rather, Transwestern will earn profits only when it makes sales. Similarly, the Commission's conclusion that fixed production costs should be fully at risk is based on a determination that Transwestern should have the incentive to minimize costs; such an incentive will motivate Transwestern to make prudent gathering and production expenditures.[9]

Transwestern does not really dispute the underlying determination of cost allocation, but maintains that it should be "guaranteed a reasonable opportunity to earn a return on its investment." The Commission's decision here does not deny Transwestern such a reasonable opportunity. The Commission has only refused to protect Transwestern's profit from competition and provided Transwestern what the Commission determined to be the appropriate incentive to run its business efficiently. "[R]egulation does not insure that the business shall produce net revenues." *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed. 1037 (1942).

### 2. *Protection of Full-Requirements Customers*

■ Minimum bills may also be justified on the ground that they protect full-requirements customers from bearing a dis-

8. *See Texas Eastern Transmission Corp.,* 30 FERC ¶ 61,144, *reh. granted in part and denied in part,* 32 FERC ¶ 61,056 (1985).

9. The Commission discussed this allocation and classification of fixed costs at greater length in the *Texas Eastern Transmission Corp.* order, *see supra* note 9. The Commission reasoned:

In the unregulated competitive world, profits are earned and maximized only if the business manages its operations efficiently and is capable of reading and acting upon price signals to determine the appropriate level of customer demand. As we move to increasing competition in the gas pipeline industry, there is no economic reason to assure pipeline profits where sales are not made. If equity return

and associated taxes are included in the commodity component to be recovered over annual throughput, Texas Eastern will earn profits only when it makes sales and transports gas and will maximize its earnings by meeting and exceeding its volume projections. This classification of profits holds the pipeline responsible for its management decisions and provides necessary incentive to Texas Eastern to purchase gas both at the quantity and at the price demanded by its customers. We will therefore adopt a modified fixed variable methodology ... in which the full equity return and associated taxes are at risk in the commodity charge of Texas Eastern's rates. 30 FERC ¶ 61,144, at 61,283 (footnote omitted).

proportionate share of fixed costs should partial-requirements customers reduce purchases in favor of alternative supplies. Presumably, a substantial swing off the system by one customer could result in higher rates for all customers, since more fixed costs would have to be recovered per unit of gas sold.

Transwestern does not argue on appeal that its minimum bills can be justified on the basis of protecting full-requirements customers. Furthermore, Transwestern did not seek to justify its bills before the Commission on this basis. The Commission chose to consider this justification out of fairness to Transwestern's full-requirements customers, even though such full-requirements customers account for less than one-half percent of Transwestern's gas sales and did not intervene before the Commission. We too address the justification to determine that the end result is not unjust.

The Commission rejected this possible justification based on evidence that actual rate increases were "modest," that any impact on Transwestern's full-requirements customers would be short-term, and that Transwestern has taken numerous steps to reduce its gas costs so that it can compete for sales to its partial-requirements customers. Such cost reduction will benefit full-requirements customers whose rates also reflect gas costs. It is also significant that Transwestern's partial-requirements customers account for 99.5 percent of Transwestern's total gas sales. Since Transwestern will certainly want to maintain sales to these customers, it stands to reason that it will seek to make its gas even more competitive. If it does so, its full-requirements customers will benefit in the long run. In any event, Transwestern's minimum bills cannot be justified on the basis that they are needed to protect full-requirements customers.

### 3. Take-or-Pay Obligations

█ Transwestern's third possible justification is the most superficially appealing. It concerns the recovery of take-or-pay obligations governing wellhead sales between it and its producers. Under a take-or-pay contract, a pipeline must take or pay for a minimum amount of gas. If partial-requirements customers purchase gas from another supplier, the pipeline may be unable to sell as much gas as it is obligated to purchase. The pipeline will then have to pay producers for gas it does not take. Take-or-pay liabilities, if prudently incurred, become a fixed cost on the system and can be passed on to customers in the form of increased rates. A minimum bill can be justified as a means of ensuring equitable recovery of take-or-pay costs from all customers. In Order No. 380, the Commission recognized that this justification is another way of assuring protection of full-requirements customers from the actions of partial-requirements customers. The Commission has always given such take-or-pay questions "special consideration," as it has done here.

The Commission recognized that a minimum bill may be permissible if used to ensure that carrying costs associated with take-or-pay liabilities will be borne by the customers that caused the liabilities to be incurred. The Commission, however, found no connection between the minimum bill payments the customers made under Transwestern's rate schedules and the carrying costs associated with take-or-pay liabilities that Transwestern could legitimately recover from its partial-requirements customers. Accordingly, the Commission found that Transwestern's minimum bills were not justified on the ground that they ensured equitable recovery from Transwestern's customers of costs associated with take-or-pay liabilities.

Transwestern does not really argue that its minimum bills are necessary to ensure equitable recovery of take-or-pay costs from all customers. Rather, Transwestern asserts that it has enormous take-or-pay obligations and that its minimum bills, even though "not precisely calibrated" to the level of its take-or-pay liability, still serve the purpose of recovering the cost of take-or-pay payments.

Transwestern acknowledges that the Commission has instituted alternative ap-

proaches to an industry-wide take-or-pay crisis, but asserts that the Commission is avoiding its responsibility to deal adequately with the dilemma. Transwestern claims that the Commission in Order No. 380 used the same "alternative approaches" argument to postpone its duty to find an adequate solution. In *Wisconsin Gas Co.*, 770 F.2d at 1159–60, the D.C. Circuit deferred to the Commission's discretion to deal with take-or-pay issues in separate proceedings.

The take-or-pay issue posed here is a separate matter which is being addressed in other proceedings before the Commission and through other means. Indeed, Transwestern currently has a proposal before the Commission to allocate costs of settling take-or-pay liability directly to the customers who caused such costs to be incurred. The Commission is not ignoring the issue. None of Transwestern's contentions invoke any proper take-or-pay justification.

The take-or-pay question is, moreover, a hypothetical issue on the record in this case. No evidence advanced indicates that Transwestern has actually made any payments to producers under its take-or-pay contracts. The Commission's decision to confront the potential take-or-pay problem through alternative approaches and in other cases has not been shown to be unreasonable, arbitrary, or capricious.

### 4. *Other Justifications*

■ The presiding ALJ considered an additional justification for Transwestern's imposition of a minimum bill. El Paso had settled on, and the Commission had approved, a 60 percent minimum bill for SoCal. Accordingly, the ALJ set Transwestern's minimum bill level at 60 percent, the same level as its major competitor. The basis of this determination was that Transwestern should not be placed in economic jeopardy.

The Commission found that setting the pipeline's minimum bill on the basis of other pipelines' minimum bills ignores the consumers. If a 60 percent minimum bill is anti-competitive it cannot be justified on the basis that it meets one other competi-

tor. If that were not so El Paso could justify its SoCal minimum bills on the basis of Transwestern's at its next rate hearing. This ping-pong effect could mean that consumers would never be free of the unwarranted cost. We are similarly convinced that there is no basis for this justification. Finally, the record shows that as part of an approved settlement, El Paso's minimum bills will be placed at the same level as Transwestern's, which means they both will be eliminated.

### E. *Sufficiency of the Record*

■ Transwestern's principle attack on the substance of the Commission's determination actually centers on what it considers to be a deficient record due to the modification of its minimum bills to exclude variable-cost recovery after Order No. 380. Since the record was created on the assumption that the lawfulness of full-cost minimum bills were at issue, Transwestern claims that there was no evidence before the Commission with respect to the competitive impact of fixed-cost minimum bills.

In its opinions, the Commission acknowledged that the variable-cost portion of Transwestern's minimum bills had been eliminated pursuant to Order No. 380. The Commission, however, was not without record evidence to rule on the lawfulness of the fixed-cost portion of Transwestern's minimum bills. Fixed costs are part of full-cost minimum bills. The question whether full-cost minimum bills should be entirely eliminated necessarily encompasses the question whether the fixed-cost portion should be eliminated also. The issues were squarely presented in the hearings before the record was closed. Kansas Power and Light Company, an intervenor before this court and a party before the Commission, supported only the elimination of variable costs, while the Commission staff and the Governor of California (also parties to the proceedings) argued for the elimination of both variable and fixed costs.

Transwestern had a full, fair opportunity to present evidence on the lawfulness of its fixed cost minimum bills. The Commission was not obligated to postpone a decision on

the lawfulness of Transwestern's minimum bills until the record was supplemented with evidence of Transwestern's actual experience with only fixed-cost recovery. The Commission fulfilled its responsibility to make "a conscientious effort to take into account what is known as to past experience and what is reasonably predictable about the future." *Wisconsin Gas*, 770 F.2d at 1158 (quoting *American Public Gas Association v. FPC*, 567 F.2d 1016, 1037 (D.C.Cir.1977), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978)). The evidence was sufficient to support the Commission's finding that even fixed-cost minimum bills could coerce SoCal and Northwest into purchasing higher-cost gas from Transwestern instead of alternative, lower-cost supplies.

### F. The Termination of the Investigation of the Other Pipelines

■ Another issue raised by Transwestern which is related to the sufficiency of the record upon which the Commission rendered its decision involves the Commission's investigation of the other interstate pipelines supplying California.[10] Transwestern contends that the Commission's competitive impact findings were lacking in support because evidence of Transwestern's competitors' minimum bills was not before the Commission. Transwestern submits that the Chief ALJ consolidated the Transwestern proceeding with the investigation of these other pipelines and with the El Paso proceeding so that the question of the lawfulness of Transwestern's minimum bills would not be decided in a vacuum. Transwestern charges that the Commission, which initially affirmed the Chief ALJ's consolidation decision, discontinued its investigation without adequate explanation why it was reversing the Chief ALJ's findings. Transwestern argues that this action along with the Commission's refusal to reopen the record after the entry of Order No. 380 was arbitrary, an abuse of discretion, and a denial of due process.

In Opinion No. 238-A, the Commission correctly rejected these additional claims that the record was deficient. The possible competitive effect of the other pipelines' minimum bills cannot alter the determination that Transwestern's minimum bills had an adverse cost effect on its customers. This finding is supported by substantial evidence in the record. Just as was the case with regard to El Paso, Transwestern's minimum bills cannot be justified by the existence of other pipelines' minimum bills.

■ Furthermore, the Commission possesses broad discretion to organize its caseload and to determine which issues are to be decided. *Fort Pierce Utility Authority v. FPC*, 526 F.2d 993, 999 (5th Cir.1976); *Louisiana Power & Light Co. v. FPC*, 526 F.2d 898, 910 (5th Cir.1976). The Commission severed the Transwestern proceeding and terminated its investigation because it determined that Order No. 380, related rehearings, and other events had mooted most of the issues in the consolidated proceeding. The Commission determined that it was more efficient to deal with the issue of the lawfulness of fixed-cost minimum bills on an individual basis. This action was neither arbitrary nor an abuse of the Commission's administrative discretion.

Transwestern also claims that the Commission's actions denied it due process but offers no legal basis for this assertion, and we can find none. To the contrary, the record demonstrates that Transwestern had a full, fair opportunity to address and submit evidence on the lawfulness of its fixed-cost minimum bills.

### G. Burden of Proof

In Opinion No. 238, the Commission erroneously held that Transwestern bore the burden of proving that its minimum bills were lawful. In Opinion No. 238-A, the Commission corrected this holding in reliance on *ANR Pipeline Co. v. FERC*, 771 F.2d 507, 514 (D.C.Cir.1985), and placed the burden of proof on the parties supporting a

---

**10.** These other pipelines are distributor-affiliated pipelines; they include Pacific Gas Transmission Co.; Pacific Interstate Transmission Co.; Pacific Offshore Production Co.; and Pacific Interstate Offshore Co.

change in Transwestern's minimum bills. Transwestern contends that the Commission has attempted to obscure the burden of proof issue and that, despite its formal correction, it really did place the burden on Transwestern to justify its minimum bills.

 The Commission required that the parties challenging Transwestern's minimum bills demonstrate that the fixed-cost minimum bills restrained trade. Transwestern submits that this is no burden at all because every contract restrains trade. But, as we discussed in a previous section, the Commission did not simply determine that Transwestern's minimum bills constituted a restraint; rather, the Commission found the minimum bills were shown to be anti-competitive based on evidence in the record concerning their purpose, past experience with Transwestern's full-cost minimum bills, and the probable consequence that fixed-cost minimum bills would have in the future. This evidence satisfied the challenging parties' burden of showing that the inclusion of minimum bills in Transwestern's rate schedules would cause competitive harm. The Commission then looked to see whether Transwestern had demonstrated justifications for the minimum bills. The burden placed on Transwestern was not a burden of persuasion. Transwestern was not required to prove by a preponderance of the evidence that its minimum bills were justified. Rather, it was a burden of production under which Transwestern was obligated merely to proffer justifications for its minimum bills. The ultimate burden of proving competitive harm remained on the parties challenging Transwestern's minimum bills and seeking their elimination.

Before the Commission, Transwestern did not attempt to justify its minimum bills on the ground that they protected full-requirements customers from cost-shifting due to fixed costs prudently incurred or even costs associated with take-or-pay payments. Yet, the Commission thoroughly considered each of those justifications, as well as Transwestern's assertions that it should recover all its fixed-costs through the guaranteed mechanism of a minimum

bill. The Commission found that Transwestern's minimum bills were not justified, in light of the competitive harm. There was no impermissible shift of the burden of proof to Transwestern.

## H. Statutory Authority

 Transwestern challenges the Commission's statutory authority to impose the remedy of total elimination of minimum bills on the basis that abrogation of its minimum bills constitutes an unlawful revocation or modification of its certificate of public convenience and necessity issued under § 7 of the NGA. The D.C. Circuit rejected this argument in *Wisconsin Gas Co.*, 770 F.2d at 1153 n. 9, and we reject it here. Section 7 does not guarantee that the original conditions upon which the certificate was authorized will never change. *See Atlantic Refining Co. v. Public Services Commission*, 360 U.S. 378, 389, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959). Section 5 of the NGA expressly empowers the Commission to change rates or practices, such as the fixed-cost minimum bills at issue here, if such provisions become unjust and unreasonable. While elimination of the minimum bills alters rates, it does not affect Transwestern's authorized service under its certificate.

## III. Summary

We uphold the Commission's orders which eliminated Transwestern's minimum bills and which terminated the Commission's investigation into the minimum bill practices of the other interstate pipelines supplying California. The Commission's conclusion that Transwestern's minimum bills unreasonably restrained trade was based on substantial evidence. It was not necessary for the Commission to delay its decision in order to permit supplementation of the record with evidence of the effects of operations after the modification of Transwestern's fixed-cost minimum bills by Order No. 380. The Commission did not abuse its discretion by terminating the other investigations. The Commission's decision to eliminate Transwestern's minimum bills in their entirety was neither arbitrary

nor capricious, but was a proper exercise of the Commission's authority to regulate rates and practices of interstate pipelines under the Natural Gas Act.

The Commission's opinions in Nos. 238 and 238–A and its related orders which terminated the investigation of other interstate pipelines are

AFFIRMED.